FILED
2019 Aug-01 PM 04:58
U.S. DISTRICT COURT
N.D. OF ALABAMA

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | } | |
| | } | |
| v. | } | |
| | } | |
| CHRISTOPHER RYAN PERDUE, | } | Case No.: 1:19-CR-78-RDP-GMB |
| | } | |
| Defendant. | } | |
| | } | |

**MEMORANDUM OPINION**

This case is before the court on Defendant Christopher Ryan Perdue's ("Perdue" or "Defendant") Motion to Suppress Evidence and Statements (Doc. # 13), filed April 16, 2019. In his Motion, Defendant seeks to suppress (1) all physical evidence obtained from what he contends was a warrantless search of his bedroom and (2) all pre- and post-*Miranda* statements he made during and after the search. (*Id.* at 1). Specifically, Defendant claims that on October 23, 2018, law enforcement officers violated his Fourth and Fifth Amendment rights when, without a warrant or his consent, they unlawfully entered and searched a bedroom he contends he was occupying, seized evidence from the bedroom, arrested him without a warrant, and elicited incriminating statements from him in violation of *Miranda v. Arizona*, 385 U.S. 436 (1966). (*Id.*). He also asks the court to suppress all post-*Miranda* statements as fruit of the prior unlawful search conducted earlier that day. (*Id.*).

After holding a suppression hearing on June 10, 2019, the court ordered the parties to submit supplemental briefing. The Motion is now fully briefed (Docs. # 14, 27-28) and ripe for review. After careful consideration, and for the reasons explained below, the court concludes that Defendant's Motion to Suppress Evidence and Statements (Doc. # 13) is due to be granted in part and denied in part.

1

## I. Findings of Fact

During the hearing, the court heard testimony from two witnesses: Talladega Police Department ("TPD") Detectives Jeremy Falkner[1] and Todd Williamon.[2] The court also accepted into evidence and reviewed three body camera videos from the responding officers, the consent-to-search form which the actual homeowner of the subject property executed, and a video and transcript of Defendant's post-*Miranda* interview. After hearing the testimony at the suppression hearing and assessing the witnesses' credibility, the court makes the following factual findings:

1. On October 21, 2018, the TPD opened an investigation concerning a report of stolen property and a related assault that allegedly occurred at a local mechanic's shop. The complainant, Ronald Roberts, worked at the mechanic's shop. He initially called the TPD to report that Terrika Brewer, whom he referred to as a friend, had been stealing property from his employer.

2. Roberts called the TPD again later that day and alleged that Brewer and Defendant (who was Brewer's boyfriend at the time) returned to the shop, assaulted him, and left the scene in a 2002 Ford Explorer that belonged to one of the shop's customers. Roberts also claimed that Defendant and Brewer stole his cell phone, cash, keys to the shop, keys to about eight other vehicles, and a "Snap-On scan tool" (an automotive diagnostic tool). The TPD reported the Explorer as stolen.

3. Talladega Police Detective Jeremy Falkner was assigned to work the investigation.

4. Detective Falkner had dealt with both Brewer and Defendant several times before (since their teenage years). He knew Defendant as a drug abuser who had a reputation for carrying

---

[1] Detective Falkner has been an officer of the TPD for over seventeen years, four and a half of which have been spent as a detective.

[2] Defective Williamon has worked for the TPD for seven years, five of which have been spent as a detective.

2

firearms and running from the police. Detective Falkner also knew that Brewer was a drug abuser with a history of minor thefts.

5. Detective Falkner did not know where Brewer was living at the time. As recently as a few weeks before the subject incident, Detective Falkner heard that Defendant was living at an apartment complex, the Talladega Downs, with his mother.

6. Detective Falkner also knew Brewer had recently spent time with Wayne Collier. Collier owned a three-bedroom residence on Brady Street in Talladega, Alabama. Collier had a reputation with the TPD because he frequently allowed drug abusers to temporarily stay at this house in exchange for drugs. Over the past five years, the TPD had discovered stolen property at his residence, particularly vehicles. Detective Falkner had never seen Defendant at Collier's residence, but he knew that Brewer had spent time there.

7. Two days after the report was made, on October 23, 2018 at approximately 10:00 a.m., Detective Falkner drove by Collier's house hoping to locate the Ford Explorer reported stolen. In fact, the vehicle was found parked outside the residence and Detective Falkner suspected that Defendant and Brewer were inside.

8. Once he saw the stolen Explorer, Detective Falkner called the TPD to ascertain whether Defendant had any outstanding warrants. He discovered that Defendant had three misdemeanor traffic warrants. He then drove back to the TPD, retrieved the warrants, and returned to Collier's residence.

9. Detective Falkner also summoned Detective Williamon, Detective McDaniel, Officer Layton, Officer Cavender, and Vincent Pitts (Officer Cavender's shadow) to the scene. All six TPD personnel arrived at Collier's residence at the same time.

10. Detective Falkner left the traffic-related warrants in his vehicle and instructed the other officers to set up a perimeter outside the house.

11. He went to the front door of Collier's residence and knocked. An occupant named David Morgan answered the door. Morgan told Detective Falkner that Collier, the homeowner, was in his bedroom. He did not allow the officers to enter at that time.

12. Moments later, Collier appeared and identified himself as the owner of the home. He seemed groggy like he had just woken up, but otherwise seemed normal based on Detective Falkner's past experiences with him. Detective Falkner told Collier that he and his officers were investigating a stolen vehicle and looking for Defendant and Brewer. Collier confirmed that Defendant and Brewer were sleeping in the second bedroom towards the back of the house. The second bedroom had an exterior door that allowed ingress and egress form outside the house.

13. Detective Falkner asked Collier if he and his other officers could enter the house and search for Defendant and Brewer. Collier agreed and stepped aside to let them inside the house.

14. Detective Falkner kept his weapon in its holster and did not threaten or coerce Collier into compliance. In fact, both Detective Falkner and Detective Williamon had received Collier's consent to enter and search his home on at least two prior occasions and related to other cases. Each time, Collier readily gave consent for the officers to search his entire home.

15. While this exchange took place, the officers outside the house approached the door that led from the outside into the second bedroom. They heard hushed voices and footsteps of people exiting the bedroom. Detective Williamon heard Brewer's voice coming from the bathroom, which was adjacent to the second bedroom.

16. Having received Collier's consent for the officers to enter his home and search for Defendant and Brewer, Detective Falkner summoned the other officers to the front door.

17. Upon entering the house, the officer saw a male and a female sitting on the couch. They did not know how many other people were in the house. With this concern in mind, Detective Falkner ordered his officers to fan out to search all three bedrooms for Defendant and Brewer.

18. Detective Williamon went to the second bedroom where Collier said that Defendant and Brewer were sleeping. He found the door wide open, and he briefly entered the room to see if either Defendant or Brewer was hiding behind the bed. He did not see Defendant or Brewer, but he noticed a Dewalt tool bag on the floor that matched the description of property reported stolen from the mechanic's shop.

19. Detective Williamon then went to Collier's bedroom and found that the door was closed. Defendant opened the door, and Detective Williamon detained him. The officers found Brewer hiding in the hall bathroom. They took Defendant to the front living room, handcuffed him, led him outside, and detained him near the exterior door that led to the second bedroom where he and Brewer had supposedly been sleeping before the officers entered the home.

20. The officers did not present Defendant with a hardcopy of the traffic related warrants or inform him why he was being arrested. They also did not Mirandize him.

21. Detective Williamon reentered the house to obtain Collier's consent to search the second bedroom. He presented Collier with a consent-to-search form which purported to allow the officers to search Collier's residence, specifically the "back bedroom w/ outdoor door." (Doc. # 22-4). Collier again gave his consent and signed the form.

22. Detective Williamon did not, however, ask for or obtain Defendant's or Brewer's consent to search the bedroom. At the time, he believed that Defendant was still living at the Talladega Downs apartments with his mother.

23. Officer Layton also recorded an exchange with Collier on his body camera. The footage captures Collier repeatedly stating, "I've got to quit drinking." However, Detective Williamon testified that Collier did not seem inebriated at any point during that morning.[3]

24. Having received Collier's consent to search the second bedroom, Detective Williamon returned to the bedroom to look for the keys to the stolen Explorer. He noticed that the room was extremely cluttered. Men's clothing was strewn all over the floor, and old food and drinks covered the bedside tables. The keys, however, were not in plain view.

25. While inside the second bedroom, Detective Williamon opened the door leading to the outside (where Defendant was handcuffed and in the custody of Officer Cavender). Without Mirandizing him, he asked Defendant where he would find the keys to the Explorer. Defendant replied that they were in his pants pocket on the floor. Again, because the floor was covered in clothing, Detective Williamon directed Defendant to come inside the bedroom and identify the pants. Defendant walked in the bedroom and gestured with his foot to a pair of sweatpants.

26. Detective Williamon picked up the pair of pants. When he did so, he noticed the barrel of a gun peeking through the pile of clothing. He concedes the gun likely would not have been visible had he not picked up the pair of sweatpants. He retrieved the gun and identified it as a loaded Bersa .380 caliber pistol. He then secured the weapon by discharging the magazine and placed it on the bed.

27. Again, without Mirandizing him, Detective Williamon asked Defendant about the firearm. Defendant replied that the gun was his.

---

[3] After careful review, the court infers Collier's statements to mean he was hungover from drinking on the night before the search. To be sure, Collier did not in any way seem impaired in the body camera footage. He was able to speak coherently, roll and light a cigarette, and walk through his house without falling or stumbling.

28. Detective Williamon continued to search the pair of sweatpants. He found the keys to the Explorer in the left pocket and a small bag containing what he suspected was methamphetamine, a loaded syringe, and Suboxone strips in the right pocket. He asked Defendant about the substance in the bag, and Defendant identified it as "ice" (methamphetamine).

29. At no time did Defendant object to Detective Williamon's presence in the bedroom or the search of his belongings. But, at no time did he consent to any search of the bedroom, either.

30. Detective Williamon later filled out a report of the search and arrest. In his report, he referred to the second bedroom as Defendant's bedroom. Williamon also testified that at some point during the arrest, Brewer told him that the second bedroom was hers.

31. Around 11:30 that morning, the officers transported Defendant to the police station where he consented to be interviewed. Before reading Defendant his *Miranda* rights, Detective Falkner asked him for his general personal information. Defendant informed Detective Falkner that he currently lived "nowhere" and that he received mail at his uncle's house in Sylacauga, Alabama.

32. Detective Falkner then read Defendant his *Miranda* rights. After formally waiving his *Miranda* rights (Doc. # 22-5), Defendant gave a statement admitting ownership of the methamphetamine, the Suboxone strips, and the gun. He also told the detective that he knew he was not supposed to have a gun.

33. Defendant was later charged under state law with Certain Persons Forbidden to Possess a Pistol, UPOCS, and Possession of Drug Paraphernalia.

## II. Analysis

Defendant seeks to suppress all physical evidence and statements obtained from what he contends was an illegal search of the bedroom he occupied in Collier's house. Defendant argues this evidence is due to be suppressed because (1) he had a reasonable expectation of privacy in the

bedroom he occupied, and (2) Collier did not have the capacity or the authority, either actual or apparent, to consent to the search of the bedroom. (Docs. # 13 at 3-5; 28 at 1-5). Defendant also contends that his statements during the search while he was in custody were obtained in violation of *Miranda*, and his post-*Miranda* statements during the police interview at the TPD are due to be suppressed as fruit of the prior unlawful search of the second bedroom. (*Id*. at 7-8; *id*. at 5). The court addresses each argument in turn and concludes that Defendant's Motion to Suppress (Doc. # 13) is due to be granted in part and denied in part.

### A. Defendant Had a Reasonable Expectation of Privacy in the Second Bedroom

To claim protection under the Fourth Amendment, a defendant bears the burden of demonstrating a legitimate expectation of privacy in the area searched. *Minnesota v. Olson*, 495 U.S. 91, 95 (1990) (citing *Rakas v. Illinois*, 439 U.S. 128, 143 (1978)). A legitimate expectation of privacy exists when (1) the defendant has a subjective expectation of privacy, and (2) society is prepared to recognize that expectation as objectively reasonable. *United States v. Harris*, 526 F.3d 1334, 1338 (11th Cir. 2008). In some circumstances, "a person may have a legitimate expectation of privacy in the house of someone else." *Minnesota v. Carter*, 525 U.S. 83, 89 (1998). For example, a defendant's "status as an overnight guest is alone enough to show that he had an expectation of privacy in the home that society is prepared to recognize as reasonable." *Olson*, 495 U.S. at 96-97. Alternatively, "[a] defendant also may establish standing by demonstrating an unrestricted right of occupancy or custody and control of the premises searched; ownership is not required, but mere presence or even possession of a key is insufficient." *United States v. Merricks,* 572 F. Appx. 753, 757 (11th Cir. 2014) (quoting *United States v. Sarda–Villa*, 760 F.2d 1232, 1236 (11th Cir. 1985)). For the reasons explained below, the court concludes that Defendant had

a reasonable expectation of privacy in the second bedroom, and he may claim protection under the Fourth Amendment.

Here, there is no dispute that Defendant did not own the home. Defendant instead argues that he had a reasonable expectation of privacy in the second bedroom because he and Brewer temporarily occupied the bedroom as invited houseguests. (Docs. # 13 at 3-4; 28 at 1-3). In making this argument, Defendant primarily points to the testimony of Detectives Falkner and Williamon. (Doc. # 28 at 1-2). They testified that when they arrived at the home, Collier identified himself as the homeowner and told them Defendant and Brewer were asleep in the second bedroom. This statement alone suggests that Defendant occupied the second bedroom with the permission of the homeowner and in a manner consistent with that of a house guest. Detective Williamon further testified that during his brief scan of the second bedroom (while searching for Defendant), he observed that the room was cluttered with old food, drinks, and men's clothing. Specifically, multiple pairs of Defendant's sweatpants were strewn across the floor. He also spotted a tool bag, which matched the description of the property reported stolen two days earlier. Detective Williamon's observations certainly suggest that someone (presumably Brewer and/or Defendant) was presently occupying the room as a house guest.

The suppression hearing revealed several other factors which support Defendant's assertion that he had a reasonable expectation of privacy in the second bedroom. First, Collier had a reputation with the TPD for routinely allowing other drug users to essentially "rent" a room in his home in exchange for drugs. And, both Detectives testified that they knew Defendant to be a drug user. They understood the same about Brewer. Second, the bedroom that Defendant and Brewer occupied had an exterior door that led to the backyard. In other words, the room's occupants had the freedom to come and go as they pleased without the knowledge or consent of

Collier, the homeowner. This freedom of use suggests that Defendant had "an unrestricted right of occupancy or custody and control" in the second bedroom during his stay in Collier's home. *Merricks,* 572 F. Appx. at 757. Finally, Detective Williamon's report documenting the search and arrest referred to the second bedroom as "his" (Defendant's) bedroom.[4] For these reasons, in addition to those addressed above, the court concludes that Defendant had a reasonable expectation of privacy in the second bedroom.

Admittedly, whether Defendant had a reasonable expectation of privacy in the second bedroom is a close question. Indeed, as the Government correctly notes, Defendant failed to conclusively establish how long he had been inside Collier's house before the search began or whether he spent the previous night in the second bedroom. (Doc. # 27 at 12). However, even if Defendant could not be considered an overnight guest in Collier's home automatically entitling him to a legitimate expectation of privacy under the reasoning in *Olson*, 495 U.S. at 96-97, the record evidence shows that Defendant still possessed "an unrestricted right of occupancy or custody and control" in the second bedroom. *Merricks,* 572 F. Appx. at 757. The court reaches this conclusion in light of the following testimony of Detectives Falkner and Williamon: (1) Collier believed and told the police that Defendant and Brewer were asleep in the bedroom just moments before the home was searched; (2) Defendant's clothes were spread across the bedroom floor; (3) old food and drinks covered the bedside tables; (4) the police knew Collier had a reputation for allowing drug users to stay in his home in exchange for drugs; (5) there was an exterior door attached to the second bedroom, which allowed ingress and egress from the bedroom to the

---

[4] To clarify, the court does not place any legal significance on Detective Williamon's description of the second bedroom as "his" (Defendant's) bedroom. That is to say, the court views this statement as simply the logical result of observing Defendant's possessions on the floor of the bedroom. It does not mean, however, that Defendant had an exclusive possessory interest in the second bedroom. So, although the court relied (at least in part) on Detective Williamon's description in concluding that Defendant had a reasonable expectation of privacy in the second bedroom, that does not contradict the court's finding below that Collier had the ultimate authority to consent to the search of the bedroom.

10

backyard without the knowledge of the homeowner; and (6) Detective Williamon's report which referred to the second bedroom as "his" (*i.e.*, Defendant's) bedroom.[5] Based on this evidence, Defendant's use of the bedroom rises above his "mere presence" in Collier's home. *Merricks,* 572 F. Appx. at 757. Because Defendant has established a reasonable expectation of privacy in the second bedroom, he is entitled to challenge the search of the bedroom under the Fourth Amendment.

### B. Collier's Consent to the Search of the Second Bedroom

Having determined that Defendant has standing to contest the search of the second bedroom, the court now turns to the question of whether Collier's consent was effective. Defendant argues that the warrantless search of the second bedroom based on Collier's consent was unlawful because Collier did not have the capacity or the authority, either actual or apparent, to consent to the search of the bedroom; therefore, the evidence obtained in the search of the second bedroom should be suppressed. (Docs. # 13 at 3-5; 28 at 1-5). The Government counters that Collier, as the homeowner, freely and voluntarily gave valid verbal consent to search the entire residence and specifically gave written consent to search the second bedroom. For the reasons explained below, the court concludes that the search did not violate Defendant's Fourth Amendment rights because Collier had both the capacity and the authority to consent. Accordingly, Defendant's Motion to

---

[5] The Government asserts that Detective Williamon's report describing the second bedroom as "his" (Defendant's) provides no support to Defendant's position because he cannot establish standing by relying on the government's theory of the case. (Doc. # 27 at 13) (citing *United States v. Henry*, 2010 WL 5559207 at *4 (N.D. Ga. Dec. 7, 2019) (R&R adopted by 2011 WL 65762 (Jan. 7, 2011) ("The government correctly contends defendant cannot show standing simply through the contentions of government agents or the theory of the government's case.")). But, as discussed above, Detective Williamon's report was merely one of the many factors the court relied upon in concluding that Defendant had a reasonable expectation of privacy in the second bedroom. To be sure, Detective Williamon's description of the second bedroom not only corroborated the description in his report that the second bedroom was Defendant's, but it also provides ample support for the court's decision that Defendant had a reasonable expectation of privacy in the bedroom.

Suppress the physical evidence obtained during the search of the second bedroom is due to be denied.

### i. Collier Freely and Voluntarily Provided His Consent to the Search of the Residence, Including the Second Bedroom

Although the Fourth Amendment prohibits unreasonable searches, "[a] search is reasonable and does not require a warrant if law enforcement obtains voluntary consent." *United States v. Spivey*, 861 F.3d 1207, 1212 (11th Cir. 2017). "Voluntary consent means that the consent to search is 'essentially' the 'free and unconstrained choice' of the occupant." *United States v. Morales*, 893 F.3d 1360, 1367 (11th Cir. 2018) (citing *United States v. Purcell*, 236 F.3d 1274, 1281 (11th Cir. 2001)). Whether an occupant's consent to search was voluntary is based on the "totality of the circumstances." *Id*. (citing *Spivey*, 861 F.3d at 1213). In evaluating voluntariness, courts consider factors such as the presence of coercive police tactics, the extent of the occupant's cooperation with the police, the occupant's awareness of his right to refuse consent, the occupant's education and intelligence, and the occupant's belief that no incriminating evidence will be found. *Id*.

The evidence produced at the suppression hearing shows that Collier freely and voluntarily gave his consent for the officers to search his home on two separate occasions. On October 23, 2018, when the officers arrived at the residence and informed Collier that they were searching for Defendant and Brewer, Collier identified himself as the homeowner and gave them permission to search the entire home. He also told the officers that he believed Defendant and Brewer were asleep in the second bedroom. In obtaining Collier's consent, the officers did not use coercive tactics or attempt to restrain Collier. *See Morales*, 893 F.3d at 1368. Specifically, they did not raise their voices, employ threats, draw their weapons, or make any promises to induce his consent. *Id*. Collier did not express reluctance, question the officers' motives, or imply that he had knowledge of

incriminating evidence inside his home. The fact that the officers did not explicitly inform Collier he had a right to refuse consent to the search does not invalidate what was otherwise validly obtained consent. *See United States v. Zapata*, 180 F.3d 1237, 1242 (11th Cir. 1999) (noting that a sheriff's failure to inform the defendant of his right to refuse consent, given the lack of any coercive behavior on the sheriff's part, was insufficient to render defendant's consent involuntary). On the contrary, the undisputed facts establish that Collier fully and voluntarily cooperated in giving his consent as he had done on at least one prior occasion with Detective Falkner.

Later during the episode, Detective Williamon also obtained Collier's voluntary, written consent to specifically search the second bedroom. After Defendant was handcuffed and taken into custody, Detective Williamon realized that the Ford Explorer keys were not in plain view in the second bedroom. This prompted him to approach Collier a second time to ask for explicit permission to search the second bedroom. Collier agreed and memorialized his consent by signing a consent-to-search form. (Doc. # 22-4). Again, the record does not indicate that Detective Williamon used any threats or other forms of coercion in obtaining Collier's consent. Importantly, when Collier signed the form, he confirmed the following: "I am giving this said written permission to [the] officers freely and voluntarily, without any threats or promises having been made, and after having been informed by said officer that I have a right to refuse this search and/or seizure." (*Id.*).

Defendant maintains that Collier's consent was involuntary because he lacked the capacity to consent due to his recent consumption of alcohol. (Doc. # 28 at 3-4). Defendant points to the body camera video of Officer Layton, which captures Collier repeatedly stating, "I've got to quit drinking." However, Detective Williamon testified that Collier did not seem inebriated at any point during that morning. And, the video evidence shows that Collier was able to speak coherently, roll

13

and light a cigarette, and walk through his house without falling or stumbling. Moreover, neither party presented any evidence about the quantity or timing of Collier's alleged alcohol consumption. For these reasons, the court interprets Collier's statements to mean that he was perhaps hungover, but not drunk. Thus, the evidence presented at the suppression hearing does not support a finding that Collier's state of mind was so impaired that he was unable to give voluntary consent to the search of his home or the second bedroom.

### ii. Collier's Authority to Consent to the Search of the Second Bedroom

Of course, even if Collier's consent to the search of the second bedroom was voluntary, it was not valid unless he had the authority to consent. A warrantless search is constitutional if it is conducted pursuant to "the voluntary consent of an individual possessing authority." *Morales*, 893 F.3d at 1368 (quoting *Georgia v. Randolph*, 547 U.S. 103, 109 (2006)). The Supreme Court has held that consent to search a private residence may be given either by the individual whose property is searched or by a "third party who possesse[s] common authority over or other sufficient relationship to the premises." *United States v. Matlock*, 415 U.S. 164, 171 (1974). Whether a third party possesses common authority over the area to be searched does not "rest upon the law of property…but rests rather on mutual use of the property by persons generally having joint access or control for most purposes." *Id.* at 172 n. 7. Valid consent may be granted by a person with either actual or apparent authority to give permission to search. *United States v. Watkins*, 760 F.3d 1271, 1279 (11th Cir. 2014). So, "even if the consenting party does not, in fact, have the requisite relationship to the premises, there is no Fourth Amendment violation if an officer has an objectively reasonable, though mistaken, good-faith belief that he has obtained valid consent to search the area." *United States v. Brazel*, 102 F.3d 1120, 1148 (11th Cir. 1997) (citing *Illinois v. Rodriguez*, 497 U.S. 177, 186 (1990)). "The determination of consent to enter must be judged

against an objective standard: would the facts available to the officer at the moment…warrant a man of reasonable caution in the belief that the consenting party had authority over the premises?" *United States v. Mercer*, 541 F.3d 1070, 1074 (11th Cir. 2008).

Defendant does not dispute Collier's authority as the homeowner to consent to a search of the common areas of his residence. *See Matlock*, 415 U.S. at 171. Rather, Defendant contends that Collier's authority to consent did not extend to the second bedroom that he and Brewer were temporarily occupying. (Docs. # 13 at 5; 28 at 4-5). The court disagrees. The evidence presented at the suppression hearing shows that when the officers requested permission to enter the residence, Collier identified himself as the homeowner and gave them consent to search the home without any limitations. He also gave the officers written consent to specifically search the second bedroom that Defendant temporarily occupied. Although Defendant's possessions were spread over the bedroom floor, there is no evidence in the record confirming how long Defendant had been a guest in Collier's home, particularly whether he spent the previous night in the bedroom or whether he had arrived the morning of the search.[6] More importantly, there is no evidence indicating that Defendant asserted *exclusive* ownership or control of the second bedroom, such that Collier did not have common authority over the area. Notably, Detective Williamon testified that when he began his search for Defendant, he found the door to the second bedroom left wide open for anyone to access. *United States v. Walker*, 2007 WL 1341111, at *8 (N.D. Ga. May 1, 2007) (noting that an open door implies that the defendant did not assert exclusive control over the searched area).

---

[6] Defendant cites *Stoner v. State of California*, 376 U.S. 483 (1964) and *McDonald v. United States*, 335 U.S. 451 (1948) for the proposition that a landlord or property owner generally cannot consent to a warrantless search of a tenant's room without the tenant's consent. (Doc. # 28 at 4). However, this argument is off the mark. As noted above, Defendant presented no evidence at the suppression hearing conclusively establishing that he spent the previous night in Collier's home or that he rented the room he occupied. Absent similar evidence demonstrating exclusive control over the second bedroom, the court cannot say that Defendant occupied the second bedroom in a manner consistent with a tenant's exclusive use of the room he rented. As such, Defendant is not entitled to the same constitutional protections as a tenant.

Consequently, the record demonstrates that Collier was the owner of the home, who retained the ultimate authority to consent to the search of the second bedroom. Defendant was (at best) a temporary guest with standing to challenge the search.

At the very least, Collier had apparent authority to consent to the search of the second bedroom.[7] This is so because Detective Williamon had an objectively reasonable, good-faith belief that Collier had the authority to consent to the search based on the information available to him at the time. *See Brazel*, 102 F.3d at 1148. The record shows that prior to the search, Detective Williamon was aware of the following: (1) Collier, as the homeowner, gave voluntary, written consent to search the second bedroom inside his residence; (2) Collier had a reputation for letting transient drug users temporarily stay in his home in exchange for drugs; (3) Collier had granted the same Detectives consent to search his entire home on a prior occasion; (4) the door to the second bedroom was left wide open for anyone to access; (5) Defendant, as recently as a few weeks prior to the search, was living with his mother in a Talladega apartment complex; and (6) there was no indication (at least in the evidence presented to the court), how long Defendant had been in the house or whether it was Brewer who was given the room to use.[8] In light of this information, Detective Williamon had no reason to believe that Collier did not have, at a minimum, shared authority over the second bedroom inside his own home—particularly since he thought Defendant lived with his mother. *See Brazel*, 102 F.3d at 1149 (finding that the officers were reasonable in believing that the searched premises were vacant because they thought the defendant lived

---

[7] The court concluded above that Defendant had an expectation of privacy in the second bedroom. However, that finding should not be conflated with a separate inquiry: whether, at the time of the search, Collier had apparent authority to consent to the search of that same bedroom.

[8] The detectives were aware that Brewer had stayed at Collier's house before; however, they were not aware of Defendant doing so. They believed Defendant was most recently staying with his mother.

16

elsewhere with his grandmother). For these reasons, the officers did not violate Defendant's Fourth Amendment rights by searching the bedroom he temporarily occupied in Collier's home.

Furthermore, Collier's consent to the search of the second bedroom was effective given Defendant's failure to object. "[I]f the person who would refuse consent isn't present or doesn't object, then the consent of the co-occupant who is there is good as against the absentee or silent co-occupant." *United States v. Morales*, 893 F.3d 1360, 1369 (11th Cir. 2018) (citing *Matlock*, 415 U.S. 164, 170-71 (1975)). Here, there is no evidence whatsoever that Defendnat objected to the search. Indeed, there is evidence to the contrary. Defendant attempts to justify his failure to object by pointing out that he was already handcuffed when Detective Williamon initiated the search of the second bedroom. (Doc. # 28 at 5). However, the Supreme Court considered a similar situation in *Matlock*. 415 U.S. at 166-67, 170-71. There, the defendant was arrested outside the house he lived in with his girlfriend and placed in a nearby squad car. *Id*. at 166, 179. Although the officers did not ask the defendant for his consent to search the home, the Court concluded that the girlfriend's consent was valid against the defendant. *Id*. at 170-71.

In *Georgia v. Randolph*, the Supreme Court considered *Matlock* and clarified that "the potential objector, nearby but not invited to take part in the threshold colloquy, loses out…[s]o long as there is no evidence that the police have removed the potentially objecting tenant…for the sake of avoiding a possible objection." 547 U.S. 103, 121 (2006). Here, Defendant does not argue (and there is no evidence suggesting) that the officers intentionally removed Defendant so that he would not be able to refuse consent. In fact, in this case, Defendant was clearly better poised to object than the defendant in *Matlock*. Defendant was detained just outside the exterior door to the second bedroom. Detective Williamon opened the exterior door to ask for Defendant's help locating the keys to the Ford Explorer. Rather than voice any objection to the search, Defendant

told Detective Williamon where to find the keys. "[H]is failure to [object] rests on him." *Morales*, 893 F.3d at 1370. Thus, the officers did not violate Defendant's Fourth Amendment rights by searching the second bedroom, and his Motion to Suppress the physical evidence obtained in the search is due to be denied.

### C. The Suppression of Defendant's Pre- and Post-*Miranda* Statements

Finally, Defendant argues that his statements during the search while he was in custody were obtained in violation of *Miranda*, and his post-*Miranda* statements during the police interview at the TPD are due to be suppressed as fruit of the prior unlawful search of the second bedroom. (*Id*. at 7-8; *id*. at 5). The Government correctly concedes that Defendant's pre-*Miranda* statements made during the search are due to be suppressed. (Doc. # 13 at 7). As such, Defendant's Motion to Suppress is due to be granted with respect to those statements. However, because the court concludes that the warrantless search of the second bedroom was lawful, Defendant's Motion to Suppress his post-*Miranda* statements as fruit of the poisonous tree is due to be denied.[9]

## III. Conclusion

For the reasons explained above, Defendant's Motion to Suppress Evidence and Statements (Doc. # 13) is due to be granted in part and denied in part. The Motion is due to be granted as to the pre-*Miranda* statements Defendant made during the search while he was in police custody. However, the Motion is due to be denied in all other respects. An Order consistent with this Memorandum Opinion will be entered.

---

[9] During the police interview at the TPD, but before Detective Falkner read Defendant his *Miranda* rights, Detective Falkner asked him a series of routine questions regarding his residency. To the extent that Defendant argues his answers to these questions are due to be suppressed, that argument has been foreclosed by Eleventh Circuit precedent. *See United States v. Sweeting*, 933 F.2d 962, 965 (11th Cir. 1991) ("An officer's request for routine information for booking purposes is not an interrogation under *Miranda*.") (internal quotations omitted). Thus, a *Miranda* warning was not required at that point during the interview.

**DONE** and **ORDERED** this August 1, 2019.

_____
**R. DAVID PROCTOR**
UNITED STATES DISTRICT JUDGE